**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

ROOD, RIDDLE AND PARTNERS, PSC,

|  |  |  |
|---|---|---|
| | Plaintiff, | 1:26-cv-385 |
| | | (ECC/PJE) |
| v. | | |
| | | |
| DR. MORGAN DAY O'BRIEN, DVM, et al., | | |
| | | |
| | Defendants. | |

---

Kyle N. Kordich, Esq., *for Plaintiff*
Jason A. Little, Esq., *for Defendants*

**Hon. Elizabeth C. Coombe, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I.    INTRODUCTION**

Plaintiff Rood, Riddle and Partners, PSC brings this diversity action against Defendants Dr. Morgan Day O'Brien, DVM (Dr. O'Brien), Racing City Recips, LLC (Racing City), and NexGen Equine Reproductive Services (NexGen) (collectively, the Defendants).  Plaintiff seeks a preliminary injunction[1] enjoining Dr. O'Brien, its former employee, from violating certain non-compete and confidentiality agreements during the pendency of the adjudication of this matter. Dkt. No. 5-2.  The motion was fully briefed, and the parties appeared at a motion hearing on May 12, 2026.  Dkt. Nos. 26, 39, 44.  The parties also filed post-hearing submissions with the Court.

---

[1] At the motion hearing Plaintiff's counsel conceded that due to the procedural posture of this case, including a delay in service of the motion papers and a joint request for an extension of time to brief the motion in light of settlement negotiations, the initial request for a temporary restraining order is moot and collapses into the request for a preliminary injunction.  The Court agreed, and denied Plaintiff's request for a temporary restraining order from the bench.  Accordingly, the only pending motion is Plaintiff's request for a preliminary injunction.

Dkt. Nos. 42, 43, 45. For the following reasons, Plaintiff's motion for a preliminary injunction is granted.

## II.    FINDINGS OF FACT[2]

Plaintiff is a professional services corporation that provides equine veterinary care. Dkt. No. 1 ¶¶ 1, 8. Plaintiff operates equine hospitals in Lexington, Kentucky; Saratoga Springs, New York; and Wellington, Florida. *Id.* at ¶ 8. Plaintiff's Saratoga location provides veterinary services including ambulatory,[3] surgery, internal medicine, imaging, reproductive, podiatry, dentistry, sport horse medicine, laboratory, and pharmacy. *Id*. at ¶ 11. Embryo transfer is one of the reproductive services offered by the Saratoga location. *Id.* at ¶¶ 13, 14. Plaintiff's clients include horse owners, horse breeders, and horse farms. *Id.* at ¶ 10.

Defendant Dr. O'Brien is a licensed veterinarian and resides in Saratoga County, New York. Dkt. No. 26-2 ¶ 2. Dr. O'Brien began working for Plaintiff's Saratoga location as a paid intern in August 2014. *Id.* at ¶ 11. After approximately one year of working as an intern, Dr. O'Brien transitioned to the role of associate veterinarian. *Id.* On October 1, 2015, Dr. O'Brien and Plaintiff executed a written employment agreement (the agreement). Dkt. No. 5-4. The agreement contains a non-compete provision, which states in relevant part:

---

[2] The facts are taken from the Complaint and the parties' submissions. *See J.S.R. ex rel. J.S.G. v. Sessions*, 330 F. Supp. 3d 731, 738 (D. Conn. 2018) ("In deciding a motion for preliminary injunction, a court may consider the entire record including affidavits and other hearsay evidence."); *Fisher v. Goord*, 981 F. Supp. 140, 173 n. 38 (W.D.N.Y. 1997) (noting that a "court has discretion on a preliminary injunction motion to consider affidavits as well as live testimony, given the necessity of a prompt decision"). The "findings are provisional in the sense that they are not binding on a motion for summary judgment or at trial and are subject to change as the litigation progresses." *trueEX, LLC v. MarkitSERV Ltd.*, 266 F. Supp. 3d 705, 721 (S.D.N.Y. 2017); *accord Fair Hous. in Huntington Comm. Inc. v. Town of Huntington*, 316 F.3d 357, 364 (2d Cir. 2003).

[3] Ambulatory refers to the practice of veterinarians traveling to where the horse is located to provide a variety of veterinary services, rather than the client shipping the horse to Plaintiff's hospital to receive care. It can include general veterinary care or more specialized services such as reproductive and fertility services. Dkt. No. 1 ¶ 12.

> Veterinarian agrees not to engage in the practice of equine veterinary medicine within the Kentucky counties of Fayette, Clark, Madison, Scott, Jessamine, Bourbon or Woodford nor within the New York counties of Saratoga, Warren, Washington, Albany, Schenectady, Montgomery, Fulton, Hamilton and Rensselaer as a participant in a partnership, joint venture, sole proprietorship, corporation, or other entity, or as an operator, investor, shareholder, partner, principal, director, employer, employee, consultant, manager, advisor, agent or in any other capacity whatsoever, directly or indirectly, other than under this Agreement, at any time both during the term of, and within two years after the termination of employment under this Agreement except as specified with or without cause and including, but not limited to, nonrenewal of this Agreement.

Dkt. No. 5-4 at 4-5. The agreement also contains a "confidential information" provision, limiting the employee veterinarian's disclosure of certain information relating to the employer's medical practice. *Id.* at 5.

Dr. O'Brien provided a variety of equine veterinary services during her employment with Plaintiff, including reproductive services. Dkt. No. 1 ¶ 21. Dr. O'Brien spent her "entire veterinary career" with Plaintiff, and Plaintiff made "substantial investments" in Dr. O'Brien's professional development during her employment, including the provision of specialized training and the supplies necessary to provide equine veterinary services. *Id.* at ¶¶ 19, 22-23.

On November 26, 2025, Dr. O'Brien verbally resigned from her employment with Plaintiff without any advance notice. Dkt. No. 1 ¶ 42. Dr. O'Brien maintains that she resigned because working for Plaintiff "became increasingly untenable." Dkt. No. 26-2 ¶ 17. More specifically, Dr. O'Brien describes a toxic work environment, as well as conduct by Plaintiff and its agents that Dr. O'Brien believed to be not only "unethical," but "illegal." *Id.* at ¶¶ 17-42. One of the issues leading Dr. O'Brien to resign was conduct displayed by Plaintiff's shareholder and supervising veterinarian, Dr. Ahlschwede. According to Dr. O'Brien, Dr. Ahlschwede and his wife, also a veterinarian for and shareholder of Plaintiff, failed to disclose their ownership of horses that they sold at auction on the veterinary reports they had performed and signed in connection with the

3

sale. *Id.* at ¶ 26. Dr. O'Brien was also aware that Plaintiff had been "considering or [in] the process of selling the company to private equity," which was an "additional factor in [her] decision to leave." *Id.* at ¶ 43.

Dr. O'Brien followed up her verbal resignation with a written letter to Plaintiff's CEO. Dkt. Nos. 1 ¶ 44; 5-5. In the letter, Dr. O'Brien raised the previously mentioned concerns about "egregious ethical violations and illegal acts" of which she was aware, and requested that Plaintiff "immediately release [her] from the overly broad non-compete provision in her contract[.]" Dkt. No. 5-5. Dr. O'Brien indicated that she "didn't say anything about these egregious breaches of ethics out of loyalty to [Plaintiff], my former employer but intend to bring them to light if my request is not met." *Id.*

Dr. O'Brien did not reach an agreement with Plaintiff, and on December 4, 2025, she returned some of Plaintiff's supplies. Dkt. No. 1 ¶ 50. Plaintiff also paid for and provided a cell phone to Dr. O'Brien during her employment. *Id.* at ¶ 51. On December 11th, Dr. O'Brien "hand-delivered the phone" to Plaintiff's practice manager in Saratoga. *Id.* at ¶ 52. "Dr. O'Brien explained . . . that she had purchased a new phone and synched the new phone to the iCloud account that had been used on her [work] phone and then reset the [work] phone to factory settings." *Id.* This resulted in the transfer of all data from Dr. O'Brien's work phone to her new phone, and Plaintiff's inability to access data on the reset work phone. *Id.*

On December 17, 2025, Plaintiff learned that "an anonymous letter" describing the Dr. Ahlschwede issue and accusing Plaintiff of unethical behavior had been sent to the Executive Director of the American Association of Equine Practitioners (AAEP). Dkt. No. 1 ¶ 59-62; *see also* Dkt. No. 5-9. The author of the letter indicated that "if action is not taken immediately," the information contained in the letter would be released to various media outlets that cover the equine

industry.  Dkt. Nos. 1 ¶ 64; 5-9 at 1.  The author also wrote that "[it's] understood that [Plaintiff] is close to selling.  This would not be a good look to a potential buyer."  Dkt. No. 5-9 at 1.  In January 2026, Plaintiff learned that one of its clients had also received an anonymous letter – identical to the second page of the letter to the AAEP – disclosing Plaintiff's intention to sell the business and accusing Plaintiff of the same unethical practices.  Dkt. Nos. 1 ¶ 67; 5-9 at 2.  Plaintiff contends that Dr. O'Brien authored these communications.[4]  Dkt. No. 1 ¶¶ 63, 67.

Dr. O'Brien formed the Defendant business entity Racing City in January 2025, while employed by Plaintiff.  Dkt. No. 26-2 ¶ 47.  The parties dispute whether Plaintiff knew of and condoned the scope of Racing City's business practices, and whether it constituted a breach of Dr. O'Brien's employment agreement.  Dkt. Nos. 1 ¶¶ 77-99; 26-2 ¶¶ 47-51; 39 at 5.  Defendant NexGen is a trade name under which Dr. O'Brien provides ambulatory equine reproductive services.  Dkt. No. 26-2 ¶ 52.  Dr. O'Brien formed a professional entity – Morgan Day O'Brien, DVM, PLLC – in February 2026, following her resignation from Plaintiff's employment.  *Id.*

In her sworn affidavit in opposition to the motion for a preliminary injunction, Dr. O'Brien represents that since leaving Plaintiff's employment, her veterinary "practice has narrowed primarily to equine reproductive medicine: embryo transfer, recipient mare management, cycle synchronization, semen collection and storage, and foaling and breeding season care."  Dkt. No. 26-2 ¶ 52.  The parties otherwise dispute the scope of Dr. O'Brien's provision of equine veterinary medicine since her resignation from Plaintiff's employment.  According to Dr. O'Brien, following her resignation she began providing equine reproductive veterinary services to two farms, Irish Hill Century Farm and Hidden Lake Farm. *Id.* at ¶¶ 54, 57, 64.  Irish Hill and Hidden Lake are both thoroughbred breeding and boarding farms. *Id.* at ¶¶ 55, 62.  Irish Hill is owned by Dr.

---

[4] Dr. O'Brien does not address these letters in her opposition to Plaintiff's motion.

O'Brien's husband.  *Id.* at ¶ 55.  Dr. O'Brien contends that these farms would not use Plaintiff for veterinary services regardless of her availability.  *Id.* at ¶¶ 61, 63.  Dr. O'Brien otherwise represents that "[b]eyond those two farms," she has "performed only *de minimis* assistance, on an informal basis, for a small number of personal friends during foaling season – work that was incidental, unsolicited, and not part of any business relationship."  *Id.* at ¶ 65.

Plaintiff maintains that since her resignation Dr. O'Brien has worked for at least two other farms, in addition to Irish Hill and Hidden Lake, providing equine veterinary services.  Dkt. Nos. 39-2 ¶¶ 1-7; *id.* Ex. 1; 39-1 ¶¶ 6-10.  Plaintiff further points out that to the extent Dr. O'Brien concedes that she continues to provide artificial reproductive equine services, she cannot be providing those services to the thoroughbred horses boarded at Irish Hill and Hidden Lake because thoroughbred horses bred for racing must be conceived naturally through "live cover."  Dkt. Nos. 39-1 ¶¶ 14-16; 39-2 ¶¶ 14-15.  Thus, according to Plaintiff, Dr. O'Brien is practicing assisted reproductive services on non-thoroughbred horses being brought to her at Irish Hill for care.  *Id.* at ¶ 16; *see also* Dkt. No. 39-2 Ex. 1.

## III.    STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy never awarded as of right." *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 666–67 (2d Cir. 2023) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* (quoting *Winter*, 555 U.S. at 20).

In some limited circumstances, "a plaintiff seeking a preliminary injunction must satisfy a heightened standard by 'show[ing] a clear or substantial likelihood of success on the merits, and

[by] mak[ing] a strong showing of irreparable harm.'" *JTH Tax*, 62 F.4th at 667 (quoting *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015)).  One such situation in which the heightened standard applies is "when the plaintiff seeks a so-called 'mandatory injunction,' rather than a 'prohibitory' one." *Daileader v. Certain Underwriters at Lloyds London Syndicate 1861*, 96 F.4th 351, 356 (2d Cir. 2024) (cleaned up).  As the Second Circuit has explained, "[p]rohibitory injunctions maintain the status quo pending resolution of the case; mandatory injunctions alter it." *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 36 (2d Cir. 2018). "In this context, the 'status quo' is really the 'status quo ante' – that is, 'the last actual, peaceable[,] uncontested status which preceded the pending controversy.'" *Id*. at 37 & n.5 (internal quotation marks and citation omitted).  The Second Circuit has further expressed that it is "inclined to 'shut[] out defendants seeking shelter under a current 'status quo' precipitated by their [own] wrongdoing." *Daileader*, 96 F.4th at 357 n.5 (quoting *N. Am. Soccer League*, 883 F.3d at 37 n.5).  Such a status quo "could not be viewed as either 'peaceable' or 'uncontested.'" *Id.* (citation omitted).

Here, the Defendants maintain that a preliminary injunction enforcing the non-compete and confidentiality provisions is a mandatory injunction that would alter, rather than preserve, the status quo. Dkt. No. 26 at 11.  Defendants neglect, however, to articulate why such a preliminary injunction would be mandatory or grapple with the issue of identifying the status quo ante, i.e. the last peaceable or uncontested status which preceded the pending controversy.  Presumably, Defendants construe the status quo to be Dr. O'Brien's post-resignation provision of equine veterinary services, or in other words, the complained-of wrongdoing forming the basis for Plaintiff's Complaint.  The Court disagrees.  The last uncontested status preceding this action was when Dr. O'Brien was still working for Plaintiff pursuant to the terms of her employment

agreement. *See, e.g., Hercules Pharms., Inc. v. Cherne*, No. 24-2545-CV, 2025 WL 1099431, at *2 (2d Cir. Apr. 14, 2025) (summary order) (agreeing that injunction against Cherne was prohibitory, rather than mandatory, where "the last peaceable uncontested status preceding the" claim for breach of non-compete existed "immediately before Cherne resigned from Hercules to begin working for NDC the same day."). Thus, a preliminary injunction seeking to enforce the employment agreement and restrain Defendants from breaching its terms is prohibitory, and Plaintiff "must therefore satisfy the comparatively less stringent – though still exacting – standard" for such relief. *New York v. Nat'l Sci. Found.*, 793 F. Supp. 3d 562, 577 (S.D.N.Y. 2025).

## IV.     DISCUSSION

### A.     Irreparable Harm

Plaintiff contends that Dr. O'Brien's operation of multiple businesses providing equine veterinary medicine "irreparably harms" its "customer relationships, reputation, customer goodwill, and ability to compete in the market." Dkt. No. 5-2 at 20. Specifically, Plaintiff contends that Dr. O'Brien is directly targeting Plaintiff's clients and providing services to them, resulting in a loss of client relationships and customer goodwill. *Id.* at 21. Plaintiff also contends that Dr. O'Brien's possession and use of customer information she obtained through her employment cannot be compensated by money damages. *Id.* Defendants maintain that Plaintiff cannot demonstrate irreparable harm, to the extent that (1) Plaintiff delayed in seeking emergency relief, (2) the clients Dr. O'Brien currently serves will not return to Plaintiff regardless of an injunction, (3) Plaintiff's revenue losses are attributable to its own conduct, (4) the remaining harm is calculable in money damages, (5) the agreement's contractual acknowledgement does not establish irreparable harm, and (6) Plaintiff's assertions of irreparable harm rests on conclusory allegations. Dkt. No. 26 at 11-19.

"A showing of irreparable harm is 'the single most important prerequisite for the issuance of a preliminary injunction.'" *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quoting *Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999)). "That is because a preliminary injunction strives to maintain the status quo in order 'to protect [the] plaintiff from irreparable injury' while awaiting final decision on the merits." *JTH Tax, LLC*, 62 F.4th at 672 (citing Wright & Miller § 2947). "To satisfy their burden to show irreparable harm, [p]laintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm.'" *Id.* (quoting *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007)). "Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." *TomGal LLC v. Castano*, No. 22-cv-9516, 2022 WL 17822717, at *3 (S.D.N.Y. Dec. 19, 2022) (quoting *Faiveley*, 559 F.3d at 118).

"The loss of customer relationships and goodwill that results from a breach of a covenant not to compete are generally sufficient to demonstrate irreparable harm." *Tecspec LLC, et al. v. Michael Donnolo, et al.*, No. 25-1676-CV, 2026 WL 1361842, at *4 (2d Cir. May 15, 2026) (summary order) (citing *Jacobson & Co. v. Armstrong Cork Co.*, 548 F.2d 438, 444–45 (2d Cir. 1977) and *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999)); *see also Devos, Ltd. v. Record*, No. 15-cv-6916, 2015 WL 9593616, at *8 (E.D.N.Y. Dec. 25, 2015) ("[I]t has consistently been held that the loss resulting from a party's breach of a restrictive covenant is not easily quantifiable by money damages and is, therefore, protectable by a preliminary injunction."); *Singas Famous Pizza Brands Corp. v. New York Advert. LLC*, No. 10 Civ. 8976, 2011 WL 497978, at *6 (S.D.N.Y. Feb. 10, 2011), *aff'd*, 468 F. App'x 43 (2d Cir. 2012) ("In general, 'a loss of

9

prospective goodwill can constitute irreparable harm.'") (quoting *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 38 (2d Cir. 1995)); *Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*, 323 F. Supp. 2d 525, 532 (S.D.N.Y. 2004) ("[W]hen a party violates a non-compete clause, [generally] the resulting loss of client relationships and customer good will built up over the years constitutes irreparable harm.").

Nevertheless, the Second Circuit has rejected the proposition that "irreparable harm must inevitably be assumed in breach of covenant cases." *JTH Tax*, 62 F.4th at 673 (quoting *Baker's Aid, Inc. v. Hussman Foodservice Co.*, 830 F.2d 13, 15 (2d Cir. 1987)). "Though courts often issue preliminary injunctions when it appears likely that the plaintiff will prevail in covenant-not-to-compete cases, this is not an automatic process, but instead depends upon the factual particulars in each case." *Baker's Aid*, 830 F.2d at 15; *Uni-World Cap. L.P. v. Preferred Fragrance, Inc.*, 73 F. Supp. 3d 209, 236 (S.D.N.Y. 2014).  To this end, "conclusory statements of loss of reputation and goodwill constitute an insufficient basis for a finding of irreparable harm." *Shepard Indus., Inc. v. 135 E. 57th St. LLC*, No. 97-cv-8447, 1999 WL 728641, at *8 (S.D.N.Y. Sept. 17, 1999).

> Here, Section 14 of the agreement provides that
>
> Veterinarian hereby agrees that, in the event of any actual or threatened breach of this Section 12 or 13, Employer will have no adequate remedy at law, will suffer irreparable injury, and that it shall be entitled to injunctive relief (both temporary and permanent) enjoining and restraining Veterinarian and any other engaged with Veterinarian from competing with Employer in violation of this Section 12 and 13 . . . .

Dkt. No. 5-4 at 5.  "While not dispositive, courts may view [such terms] as evidence of an admission that irreparable harm has occurred." *Hercules Pharms., Inc. v. Cherne*, No. 24-cv-5659, 2024 WL 4406899, at *2 (E.D.N.Y. Sept. 18, 2024) (collecting cases), *aff'd*, No. 24-2545-CV, 2025 WL 1099431 (2d Cir. Apr. 14, 2025).  Accordingly, without viewing this provision as dispositive, the Court considers it as evidence in favor of the view that Plaintiff and Dr. O'Brien

agreed that a breach of the restrictive covenants in the agreement is likely to cause irreparable harm. *See, e.g., FTS Business Consultants, Inc. v. Cullen Baker*, No. 26-cv-6251, 2026 WL 1078215, at *7 (W.D.N.Y. Apr. 21, 2026).

There is other evidence that failure to enjoin Defendants is likely to cause irreparable harm. This includes evidence that since her resignation Dr. O'Brien has spoken with, and performed work for, Plaintiff's clients. Defendants attempt to minimize the weight of this evidence by contending Dr. O'Brien's work has been of an intentionally limited scope, and only for clients who would not otherwise use Plaintiff's services. However, Dr. O'Brien concedes that she is providing services to clients beyond Irish Hill and Hidden Lake, and Plaintiff has offered evidence that a separate client recently left its services to use Dr. O'Brien. Plaintiff has also presented evidence that Dr. O'Brien, through the Defendant business entities, is advertising and actively soliciting clients over social media to perform services that would fall under the category of equine veterinary care.

The Court has considered Defendants' remaining arguments surrounding irreparable harm, and find them to be without merit. Based on the previously mentioned evidence, Plaintiff has sufficiently shown the threat of irreparable harm in the absence of injunctive relief. *See, e.g., Nat'l Elevator Cab & Door Corp. v. H&B, Inc.,* 282 F. App'x 885, 887 (2d Cir. 2008) (affirming the district court's conclusion that the defendant's solicitation of the plaintiff's clients in violation of a non-compete provision would likely harm the plaintiff's good will); *FTS Bus. Consultants, Inc.*, 2026 WL 1078215, at *7 (plaintiff sufficiently established threat of irreparable harm in the absence of injunctive relief based on evidence including contractual acknowledgment of irreparable harm and additional evidence that plaintiff has been informed by its clients that they are being solicited by defendant).

11

B.      Likelihood of Success on the Merits

Plaintiff maintains that it is likely to succeed on the merits of its claims for breach of and tortious interference with the non-compete and confidentiality provisions.  Dkt. No. 5-2 at 25-31. Specifically, Plaintiff contends that Dr. O'Brien, through her sworn affidavit, has admitted to providing equine veterinary services in violation of the non-compete provision.  Plaintiff further argues that Dr. O'Brien has admitted to the possession and use of client information accumulated throughout the course of her employment with Plaintiff.   In opposition to the motion, Defendants contend that Plaintiff will not succeed on the merits of its claims because the non-compete provision is unenforceable, and Plaintiff's client list is not confidential information subject to the restrictive covenant.  Dkt. No. 26 at 19-26.

"To warrant a preliminary injunction, Plaintiffs need not show that there is a likelihood of success on the merits of all of their claims for relief. Rather, Plaintiffs must show a likelihood of success on the merits of at least one of their claims." *Upsolve, Inc. v. James*, 604 F. Supp. 3d 97, 109 (S.D.N.Y. 2022) (quoting *L.V.M. v. Lloyd*, 318 F. Supp. 3d 601, 618 (S.D.N.Y. 2018)), *vacated and remanded on other grounds,* 155 F.4th 133, 136 (2d Cir. 2025); *see also FTS Bus. Consultants, Inc.*, 2026 WL 1078215, at *8 ("[C]ourts have found that the plaintiffs need not satisfy the standard for *all* of their claims for relief, but only on at least *one* of their claims."). Accordingly, the Court limits its examination to Plaintiff's claim against Dr. O'Brien for breach of the non-compete provision.

In order to do so, the Court must first address the parties' dispute over whether the employment agreement should be governed by Kentucky or New York law.  The agreement provides: "This Agreement has been negotiated and executed in the Commonwealth of Kentucky and the laws of that state shall govern its construction and validity."   Dkt. No. 5-4 at 6.

12

Notwithstanding this provision, Defendants argue that New York law should apply because New York has the most significant contacts with the employment relationship, and enforcing the choice-of-law provision would violate New York public policy.  Dkt. No. 26 at 19-23.

"When undertaking a choice-of-law-analysis, a federal court sitting in diversity jurisdiction applies the choice-of-law principles of the state in which it sits." *Reiff v. CyberRisk All., LLC*, No. 25-cv-6351, 2025 WL 3019938, at *2 (S.D.N.Y. Oct. 29, 2025) (citing *Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 556 (2d Cir. 2000)).  Thus, this Court applies New York choice-of-law principles to determine what law applies to Plaintiff's breach of contract claim.

"Under New York law, great deference is to be given a contract's designation of the law that is to govern disputes arising from the contract, and that designation is determinative if the state selected has sufficient contacts with the transaction." *Zerman v. Ball*, 735 F.2d 15, 20 (2d Cir. 1984); *see also Int'l Bus. Machines Corp. v. Mueller*, No. 14-cv-9221, 2017 WL 4326114, at *4 (S.D.N.Y. Sept. 27, 2017). "If a claim falls within a contract's choice-of-law provision and the provision calls for application of a certain state's law, that law will generally be applied so long as the chosen law bears a reasonable relationship to the parties or the transaction, but it will not be applied where the chosen law violates some fundamental principles of justice, some prevalent conception of good morals, some deep-rooted tradition of the common weal." *DF Ventures, LLC v. Aaron & Gianna*, *PLC*, No. 22-cv-9586, 2024 WL 916343, at *10 (S.D.N.Y. Mar. 4, 2024) (cleaned up); *see also United States v. Moseley*, 980 F.3d 9, 20 (2d Cir. 2020) ("New York law is unambiguous in the area of express choice of law provisions in a contract. Absent fraud or violation of public policy, contractual selection of governing law is generally determinative so long as the State selected has sufficient contacts with the transaction." (quoting *Int'l Minerals & Res., S.A. v.*

13

*Pappas*, 96 F.3d 586, 592 (2d Cir. 1996)); *East Capital Invs. Corp. v. GenTech Holdings, Inc.*, 590 F. Supp. 3d 668, 677 (S.D.N.Y. 2022) ("[C]ourts may refuse to enforce a choice-of-law clause only where (1) the parties' choice has no reasonable basis or (2) application of the chosen law would violate a fundamental public policy of another jurisdiction with materially greater interests in the dispute.") (quoting *Beatie & Osborn LLP v. Patriot Sci. Corp.*, 431 F. Supp. 2d 367, 378 (S.D.N.Y. 2006)).

Here, Defendants' argument that the Court should decline to enforce the choice-of-law provision is unpersuasive. Kentucky bears a reasonable relationship to the parties and to the transaction – Plaintiff is incorporated and has its principal place of business in Kentucky, and Dr. O'Brien attended training at Plaintiff's Kentucky headquarters. *See Amerisure Ins. Co. v. Selective Ins. Grp., Inc.*, No. 21-1516, 2023 WL 3311879, at *3 (2d Cir. May 9, 2023) (summary order) ("Since EDC has its principal place of business in Virginia, we conclude that the state selected in the Subcontract has sufficient contacts with the transaction, and that Virginia law governs the interpretation of the Subcontract.") (citing *Cap Gemini Ernst & Young, U.S., L.L.C. v. Nackel*, 346 F.3d 360, 366 (2d Cir. 2003) ("sufficient contacts" requirement satisfied where one party to transaction has principal place of business in state selected)). Otherwise, Defendants have failed to show how the application of Kentucky law would violate a fundamental public policy of New York, particularly considering the similar standards required in each state to enforce such a provision.

Having determined that the agreement is governed by Kentucky law, the Court examines the second threshold issue raised by the parties – whether the agreement was supported by adequate consideration. Plaintiff has offered evidence that Dr. O'Brien entered into the agreement at the start of her employment as an associate veterinarian with Plaintiff, and that the agreement

14

contained "reciprocal promises such as [Plaintiff's] agreement to terminate her only with cause or upon 90 days' advance notice." Dkt. No. 5-2 at 26. Plaintiff also offers evidence of its significant investment into Dr. O'Brien's professional development during her employment. *Id.* On this record, the Court agrees that Plaintiff is likely to succeed in establishing that the agreement was supported by adequate consideration under Kentucky law. *See, e.g., Alph C. Kaufman, Inc. v. Cornerstone Indus. Corp.*, 540 S.W.3d 803, 813 (Ky. App. 2017) ("When the employee executes the covenant not to compete at the same time he accepts employment, the latter becomes the consideration for the covenant."); *Ecolab, Inc. v. Shanklin*, No. 3:23-cv-215, 2023 WL 4365933, at *5 (W.D. Ky. May 12, 2023) ("Consideration may also be found where, after execution of an employment agreement, an employee continue[s] to be employed for a number of years and receive[s] raises and promotions while employed or acquire[s] specialized knowledge training, and expertise in the collection business which they might not have otherwise acquired.") (cleaned up); *see also Shah v. Am. Synthetic Rubber Corp.*, 655 S.W.2d 489, 492 (Ky. 1983) ("We join a number of other jurisdictions which hold that parties may enter into a contract of employment terminable only pursuant to its express terms—as 'for cause'—by clearly stating their intention to do so, even though no other considerations than services to be performed or promised, is expected by the employer, or performed or promised by the employee.").

As for the enforceability of the non-compete agreement, "[c]ourts in . . . Kentucky look to the reasonableness of a noncompetition agreement to determine whether the agreement is enforceable." *AWP, Inc. v. Safe Zone Servs., LLC*, No. 3:19-cv-00734, 2022 WL 989133, at *7 (W.D. Ky. Mar. 31, 2022), *appeal dismissed*, No. 22-5373, 2022 WL 16557352 (6th Cir. Oct. 4, 2022) (citing *Advanced Sols., Inc. v. Chamberlin*, No. 07-612-C, 2007 WL 4215654, at *5 (W.D. Ky. Nov. 27, 2007) ("[I]n Kentucky, ancillary covenants such as a covenant not to compete are

15

valid and enforceable if the terms are reasonable in light of the surrounding circumstances.")); *see also Ecolab, Inc.*, 2023 WL 4365933, at *5 ("[I]t has been held in Kentucky that an agreement in restraint of trade is reasonable if, on consideration of the subject, nature of the business, situation of the parties and circumstances of the particular case, the restriction is such only as to afford fair protection to the interests of the covenantee and is not so large as to interfere with the public interests or impose undue hardship on the party restricted.") (quoting *Hammons v. Big Sandy Claims Serv., Inc.*, 567 S.W.2d 313, 315 (Ky. Ct. App. 1978)).  In assessing the reasonableness of the agreement, the Court considers "(a) the nature of the business or profession and employment, including the character of the service that is performed by the particular employee; (b) the duration of the restriction; and (c) the scope and/or territorial extent of the restriction." *Id.* at *6 (quoting *Fruit of the Loom, Inc. v. Zumwalt*, No. 1:15-cv-131, 2015 WL 7779524, at *4 (W.D. Ky. Dec. 1, 2015)).

Dr. O'Brien is a licensed veterinarian who, while employed with Plaintiff, provided "a variety of general equine veterinary care."  Plaintiff has set forth evidence that it has made a substantial investment in Dr. O'Brien's training and professional development in the specific field of equine veterinary medicine, and that she has developed specialized skills in this field as a result. The non-compete provision of the agreement restricts Dr. O'Brien from practicing equine veterinary medicine for a period of two years after her employment in specific counties where Dr. O'Brien provided equine veterinary services as an ambulatory associate veterinarian for Plaintiff. The agreement does not restrict Dr. O'Brien's ability to practice other forms of veterinary medicine.  Courts have found similar restrictions preventing an individual from immediately using the specialized skills he or she has gained from years of employment for the benefit of another. *See, e.g., Gardner Denver Drum LLC v. Goodier*, No. Civ.A 3:06-cv-4-H, 2006 WL 1005161, at

16

*8 (W.D. Ky. April 14, 2006) ("Goodier's relationships with Drum's distributors and his knowledge of the industry is highly significant, and obviously valuable to Tuthill, his new employer. The Covenant seeks to protect Drum's investment in Goodier by preventing him (and Tuthill, by implication) from immediately using the skills he gained from years of employment at Drum for the benefit of Tuthill."); *Fruit of the Loom*, 2015 WL 7779524, at *4 (granting injunctive relief to prevent former sales employee from engaging in sales of similar products for a competitor).

Furthermore, courts have held that similar, if not greater, temporal and geographic scopes contained in a non-compete provision are not unreasonable. *See Mgmt. Registry, Inc. v. Calvetti*, No. 3:18-cv-00201, 2018 WL 1660087, at *1 (W.D. Ky. Apr. 5, 2018) (two-year non-compete reasonable); *Gardner*, 2006 WL 1005161, at *8 (three-year non-compete reasonable); *Edwards Moving & Rigging, Inc. v. Lack*, No. 214-cv-02100, 2014 WL 12531102, at *1 (W.D. Tenn. Mar. 5, 2014) (upholding non-compete pursuant to Kentucky law with "a duration of two years . . . and a national geographic scope, considering [the company's] geographic range of business" explaining that such clauses "have been deemed reasonable under Kentucky law"); *Hammons v. Big Sandy Claims Serv., Inc.*, 567 S.W.2d 313, 315 (Ky. Ct. App. 1978) ("It was not an unreasonable restriction by the trial court to restrict his business within 200 miles of Middlesboro when you consider the nature of the business.").

Dr. O'Brien does not meaningfully dispute that she has "engage[d] in the practice of equine veterinary medicine" in violation of the terms of the agreement since her resignation. Even assuming, however, that the work she admits to performing for Irish Hill and Hidden Lake does not violate the terms of the non-compete, there is sufficient evidence offered by Plaintiff and admissions made by Dr. O'Brien herself that Dr. O'Brien's provision of equine veterinary

17

medicine has expanded to other farms and former clients of Plaintiff within the restricted geographic area.  For all of the above reasons, on the limited record at this juncture the Court finds that Plaintiff will likely be successful in its claim against Dr. O'Brien for breach of the non-compete provision.

### C.    Balance of Equities and Public Interest

Dr. O'Brien contends that the balance of equities tips in her favor, namely because enforcing the non-compete agreement would bar her from pursuing work in her field to the detriment of her role as financial provider for her family, as well as create a hardship to the farms she currently services, who would be without her veterinary care and thus face financial crisis. Dkt. No. 26 at 26-29.  For several reasons, this argument is unpersuasive.  First, enforcing the non-compete provision of the agreement would not force Dr. O'Brien to "abstain from plying [her] trade," as Defendants suggest.  Dr. O'Brien remains free to practice any other form of veterinary medicine within the geographically restricted area, or to alternatively practice equine veterinary medicine outside the identified counties.  Second, to the extent Dr. O'Brien represents that she is only providing a specific, limited form of equine veterinary service to Irish Hill and Hidden Lake, who would otherwise be without options, Plaintiff has agreed to tailor its request for a preliminary injunction to permit Dr. O'Brien to continue performing such work.  Defendants fail to persuade the Court how the balance of hardships favor them in light of these concessions.

On the other hand, Plaintiff has established that it would suffer hardship if its request for preliminary injunctive relief were denied, to the extent Dr. O'Brien continues her breach of the non-compete provision.  *See, e.g., Cortland Line Holdings LLC v. Lieverst*, No. 18-cv-307 (TJM/DEP), 2018 WL 8278554, at * 9 (N.D.N.Y. Apr. 6, 2018) (finding balance of hardships favored plaintiffs, "who hired [d]efendant with the understanding that he would not compete with

18

[plaintiff] for two years after leaving the company, and would not use confidential company information to do so," because "[f]ailing to receive the benefit of its bargain would create a hardship to the Plaintiffs"); *Uni-World*, 73 F. Supp. 3d at 237 (finding that the balance of hardships weighed heavily in the plaintiffs' favor because the injunctive relief sought merely barred the defendant from violating his non-compete agreements and "would not impose any new legal duty on him; instead it would give necessary teeth to an existing contractual duty[;]" whereas the plaintiffs "would suffer a substantial hardship if their request were denied, because [the defendant] would be likely to continue his breach of the non-compete.").

Last, the Court finds that the public interest would not be disserved by the issuance of a preliminary injunction in this action. It is well settled in this Circuit that in a case such as this, "injunctive relief would serve the public interest by ensuring that reasonable restrictive covenants into which the parties voluntarily entered are enforced." *JTH Tax, Inc. v. Sawhney*, No. 19-cv-4035, 2019 WL 3051760, at *7 (S.D.N.Y. July 11, 2019); *see also Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 897 (2d Cir. 2015) (holding, "to the extent it is implicated, the public interest here is served by the enforcement of the parties' lawful agreement"); *Uni-World*, 73 F. Supp. 3d at 237 ("the public interest would be advanced by such an injunction, because, on the facts here, such an injunction would tend to encourage parties to abide by their agreements.").

Based on the foregoing,[5] Plaintiff has met its burden under Federal Rule of Civil Procedure 65 to warrant a preliminary injunction in its favor.

---

[5] To the extent not specifically addressed, the Court has considered the remainder of the Defendants' arguments and finds them to be without merit.

**D.      Bond**

Plaintiff asks this Court to waive the requirement of a security bond in granting a preliminary injunction.  Dkt. No. 5-2 at 32-33.  Defendants do not request bond in their motion papers, nor do they address Plaintiff's request to waive the requirement.

"Under Rule 65(c), before issuing a preliminary injunction, the court must order the moving party to provide a security ('post bond') in an amount the court determines would cover damages sustained in the event a party has been wrongfully enjoined." *Vans, Inc. v. MSCHF Prod. Studio, Inc.*, 88 F.4th 125, 143 (2d Cir. 2023) (citing Fed. R. Civ. P. 65(c) ("The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained.")).  "Rule 65(c) gives the district court wide discretion to set the amount of a bond, and even to dispense with the bond requirement where there has been no proof of likelihood of harm, or where the injunctive order was issued to aid and preserve the court's jurisdiction over the subject matter involved." *Doctor's Assocs., Inc. v. Distajo*, 107 F.3d 126, 136 (2d Cir. 1997) (internal quotation marks omitted).

The Second Circuit has held that "where the party opposing an injunction does not request security, the district court does not err in failing to order it."  *Vans, Inc.*, 88 F.4th at 143.  Furthermore, Dr. O'Brien agreed when she executed the agreement to "waive any requirement for the posting or securing of any bond in connection with obtaining" injunctive relief.  Dkt. No. 5-4 at 6.  *See New Horizons Educ. Corp. v. Krolak Tech. Mgmt. of Syracuse, LLC*, No. 5:18-cv-01223 (BKS/DEP), 2018 WL 5253070, at *10 (N.D.N.Y. Oct. 22, 2018) (recognizing that "[t]he parties may agree to waive the bond requirement" and collecting cases).  Finally, Defendants have not provided any information from which the Court could determine a reasonable measure of the

20

damages that they might incur as a result of the preliminary injunction. *See Intertek Testing Services, N.A., Inc.*, 443 F. Supp. 3d at 347 (declining to require bond where parties had not demonstrated defendant's salary or any other basis for determining damages). For all of these reasons, the Court declines to require Plaintiff to post bond upon issuance of the preliminary injunction.

## V.     CONCLUSION

For these reasons, it is hereby

**ORDERED** that Plaintiff's request for a preliminary injunction enforcing the non-compete and confidentiality provisions of the agreement is **GRANTED**, and pending a final disposition of this action or an Order by this Court vacating the preliminary injunction, it is further

**ORDERED** that Defendants are enjoined from engaging in the practice of equine veterinary medicine within the Kentucky counties of Fayette, Clark, Madison, Scott, Jessamine, Bourbon and Woodford; and within the New York counties of Saratoga, Warren, Washington, Albany, Schenectady, Montgomery, Fulton, Hamilton and Rensselaer; as a participant in a partnership, joint venture, sole proprietorship, corporation, or other entity, or as an operator, investor, shareholder, partner, principal, director, employer, employee, consultant, manager, advisor, agent or in any other capacity whatsoever, directly or indirectly, except that Dr. O'Brien may practice equine veterinary medicine with respect to thoroughbred horses bred for racing permanently or seasonally boarded at Irish Hill Century Farm or Hidden Lake Farm, and it is further

**ORDERED** that Defendants are enjoined from disclosing (i) all confidential information relating to Dr. O'Brien's medical practice and Plaintiff which has not been published or disseminated outside of Plaintiff or its employees and advisors or which has not otherwise become

21

a matter of general public knowledge; (ii) all information or data reasonably identified at the time by Plaintiff to Dr. O'Brien as being confidential; (iii) all names and records, including office charts, hospital charts, films, correspondence regarding patient treatment, care and billing, billing records, insurance records, and reports for all patients of the veterinary medical practice conducted by Plaintiff and Dr. O'Brien; (iv) all price lists, fees and fee schedules, and all reports and other documents disclosing same; and (v) all or any portion or phase of any financial information, business plans, accounting data, or other financial or business information.

**IT IS SO ORDERED.**

Dated: June 18, 2026

_____
Elizabeth C. Coombe
U.S. District Judge